# IN THE UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF ARKANSAS
# CENTRAL DIVISION

**TAQUILLA HATCH**                                                                                              **PLAINTIFF**

v.                                            Case No. 4:21-CV-1097-LPR

**OPTUM SERVICES, INC.**                                                                              **DEFENDANT**

## ORDER

Plaintiff Taquilla Hatch has filed this lawsuit against her former employer, Optum Services, Inc. She alleges that Optum racially discriminated against her in violation of Title VII of the Civil Rights Act of 1964 and breached an oral contract to hire her full-time after six to nine months of satisfactory job performance.[1] Optum filed a Motion to Compel Arbitration and to Dismiss or Stay this Case.[2] For the reasons provided below, Optum's Motion is DENIED.[3]

## BACKGROUND

Maxim Healthcare Services, Inc. acts as a staffing agency for multiple corporate clients in need of employees.[4] Optum is one of Maxim's clients.[5] In September of 2018, Maxim hired Ms.

---

[1] Compl. (Doc. 1) ¶¶ 16, 36–48.

[2] Def.'s Mot. to Compel Arb. (Doc. 7).

[3] Optum filed its Motion to Compel Arbitration on March 24, 2022. *Id.* Under Local Rule 7.2(b), Ms. Hatch's Response was due by April 7, 2022. Ms. Hatch did not request an extension of time. Instead, she filed her Response on April 12, 2022. Pl.'s Resp. to Mot. to Compel Arb. (Doc. 9); Pl.'s Br. in Supp. of Pl.'s Resp. to Mot. to Compel Arb. (Doc. 10). The next day, Ms. Hatch filed a Motion asking the Court to accept her untimely Response. Pl.'s Mot. to Accept Belated Resp. (Doc. 11). Because the Motion failed to provide a sufficient reason for the late Response, the Court denied the Motion and struck Ms. Hatch's Response from the record. Order (Doc. 13). At the June 2, 2022 hearing, however, after it became fairly apparent that both parties had briefed the crucial issue in the Motion using the wrong state's law, the Court ordered supplemental briefing. Clerk's Mins. (Doc. 15). Ms. Hatch timely filed her supplemental brief on June 15, 2022. Pl.'s Resp. in Opp'n to Mot. to Compel Arb. (Doc. 16). Thus, for the purposes of this Order, the Court has considered Ms. Hatch's June 15, 2022 brief, but not her April 12, 2022 submission.

[4] Compl. (Doc. 1) ¶¶ 9–10; *see also* June 2, 2022 Hr'g Tr. (Rough) at 15.

[5] Compl. (Doc. 1) ¶ 10.

Hatch to work as a temporary Community Health Worker at Optum.[6]

As part of the hiring process, Maxim and Ms. Hatch entered into a Mutual Agreement to Arbitrate ("Agreement").[7]  The Agreement is signed by Ms. Hatch and Maxim.[8]  Optum is not a signatory to the Agreement.  The specific language of the Agreement is important to the resolution of the pending Motion.  So the Court attaches the full Agreement to this Order.  The Agreement opens as follows:

> In return for the mutual agreement to arbitrate contained herein and my application for and/or my employment with MAXIM HEALTHCARE SERVICES, INC. or any affiliated company and/or any of its parents, subsidiaries, affiliates, agents, officers, directors, successors, agents, assigns, employees (hereinafter referred to as "MAXIM"), Employee (referred to in this Agreement as "EMPLOYEE", "me", or "my") and MAXIM (collectively, "the parties") agree that:
>
> Any disputes, claims, complaints or controversies ("Claim(s)") between me and MAXIM arising out of and/or directly or indirectly related to my application for employment with MAXIM, my employment with MAXIM, the terms and conditions of my employment with MAXIM, and/or the termination of my employment with MAXIM, will be resolved by arbitration and NOT by a court or jury as set forth herein.
>
> MAXIM believes that it is in the best interest of both EMPLOYEE and MAXIM to resolve Claim(s) without litigation. Most Claims are resolved internally through MAXIM's grievance and complaint processes. When such Claims are not resolved internally, EMPLOYEE and MAXIM agree to resolve through final and binding arbitration as described below.[9]

The Agreement then identifies the "Claims covered by [the] Mutual Agreement to Arbitrate."[10]

---

[6] *Id.* ¶¶ 9–10, 14.  Although Maxim called Ms. Hatch a Community Health Worker, Optum called her a Mental Health Assessor.  *Compare id.* ¶ 9 ("The plaintiff was hired by Maxim . . . working as a . . . Community Health Worker for Optum . . . ."), *with id.* ¶ 19 ("When the plaintiff was hired by [Optum], she was hired in as a mental health assessor.").  It appears these are simply different names for the same job.

[7] Ex. A to Def.'s Mem. in Supp. of Mot. to Compel Arb. (Doc. 8-1).

[8] *Id.* at 8.  This exhibit has two sets of page numbers that do not align with each other.  One set is the numbering of the original document (at the bottom of the pages).  The other is the set assigned by the Court's e-filing system (at the top of the pages).  The Court will use the numbers at the top of the pages, assigned by the e-filing system, when referencing specific pages of the Agreement.

[9] *Id.* at 2.

[10] *Id.* (emphasis omitted).

Specifically, the Agreement provides:

> EMPLOYEE and MAXIM mutually agree to arbitrate before a neutral arbitrator exclusively on an individual basis (and not on a class, collective or representative basis) any and all Claims between EMPLOYEE and MAXIM, that arise out of or relate to EMPLOYEE's recruitment, application, employment or separation from employment with MAXIM, including Claims involving any current or former officer, director, shareholder, agent or employee of MAXIM, whether the Claims arise under common law, or in tort, contract, or pursuant to a statute, regulation, or ordinance now in existence or which may in the future be enacted or recognized. Including, but not limited to, the following Claims . . . .[11]

A long (but non-exhaustive) list of claims follows, including "Claims for . . . breach of contract" and "Claims for discrimination . . . under any and all federal, state, or local statutes . . . ."[12]

In a later section of the Agreement—titled "Class, collective or representative action waiver"—the parties agree that "[t]he arbitrator's authority to resolve disputes and make awards under this Agreement to arbitrate is limited to disputes between: (i) EMPLOYEE and MAXIM; and (ii) EMPLOYEE and any current or former officers, directors, employees and agents, if such individual is sued for conduct arising out of the[] scope of his/her employment with MAXIM."[13] They further agree that "[n]o arbitration award or decision will have any preclusive effect as to issues or Claims in any dispute with anyone who is not a named party to the arbitration."[14]

Closer to the end of the document, the Agreement also notes that it "supersedes any prior agreement between the parties concerning the subject matter of Claims resolution, including any disputes, claims, complaints or controversies arising between EMPLOYEE and MAXIM, arising out of and/or directly or indirectly related to [the EMPLOYEE'S] employment with MAXIM, the

---

[11] *Id.*

[12] *Id.*

[13] *Id.* at 4.  The Agreement reads: "if such individual is sued for conduct arising out of *their* scope of his/her employment . . . ."  *Id.* (emphasis added).  The Court finds that the drafters must have intended to write "the" where they erroneously wrote "their."  Thus, the Court chalks "their" up to a scrivener's error.

[14] *Id.*

3

terms and conditions of [that] employment, [the EMPLOYEE'S] application for employment and/or termination of [that] employment."[15]

One does not have to be clairvoyant to see the $64,000 question coming down the pike here. The Agreement is replete with specific references to Maxim.[16] It is also replete with specific references to claims between an employee and Maxim.[17] But Maxim is not a defendant in our case. Optum is. And Optum is (therefore) the one seeking to force arbitration based on the Agreement. Can Optum do so? That is a harder question than it seems. In any event, before turning to that question, a little more background is necessary.

During her time at Optum, Ms. Hatch worked as a Mental Health Assessor.[18] In that capacity, she performed mental health assessments on patients in "homes, hospitals, and juvenile detention facilities . . . ."[19] Ms. Hatch alleges in her Complaint that "Optum dictated [her] work schedule, and . . . provided [her] with . . . a computer, cell phone, and internet hot spot."[20] If Ms. Hatch needed time off or to arrive to work tardy, she would coordinate with Optum officials.[21] According to Ms. Hatch, she only dealt with Maxim "to receive her paycheck[,] to take a [tuberculosis] skin test once per year," and when Optum notified Maxim of performance issues.[22]

---

[15] *Id.* at 6–7.

[16] *See, e.g., id.* at 2.

[17] *Id.*

[18] Compl. (Doc. 1) ¶¶ 9, 19. As far as the Court can tell, Optum and Ms. Hatch did not have a written employment agreement. *See* June 2, 2022 Hr'g Tr. (Rough) at 17. For that matter, it is not apparent that Maxim and Ms. Hatch had a written employment agreement (to be distinguished from their agreement to arbitrate) either.

[19] Compl. (Doc. 1) ¶ 21.

[20] *Id.* ¶ 11.

[21] *Id.* ¶ 12.

[22] *Id.* ¶¶ 13, 15. Optum does not dispute these alleged facts. Indeed, Optum embraces them in its argument in support of its Motion to Compel Arbitration. Def.'s Suppl. Mem. in Supp. of Mot. to Compel Arb. (Doc. 17) at 6–7. Based on these alleged facts, Optum argues that Ms. Hatch must be making an assertion that Optum and Maxim "act[ed] jointly and interdependently," and thus were joint employers. *Id.* at 7. According to Optum, if Maxim and Optum

Ms. Hatch alleges that, at the beginning of her work with Optum, an Optum manager or supervisor told her that she would be converted from a part-time temporary employee to a full-time employee within six to nine months of her hire.[23] Conversion to full-time employment would have brought with it enhanced benefits, including a pay raise, bonuses, new insurance benefits, paid time off, holiday time off, and a 401(k).[24] Understandably, after nine months, Ms. Hatch sought conversion to a full-time employee position. But she was not successful.

According to Ms. Hatch, she spoke multiple times with her first Optum supervisor, Mr. David Eidt, about obtaining full-time employee status.[25] She alleges that Mr. Eidt told her that she had "exemplary" performance and that he would "submit her name for recommendation to move to a full-time position."[26] Sometime later, in February of 2021, Ms. Hatch's new supervisor, Ms. Wanda Collins, allegedly told her similar things.[27] Still, she was not hired (i.e., converted to) full-time. Because of this, Ms. Hatch resigned her position with Optum on April 1, 2021.[28]

Ms. Hatch maintains that she was not hired full-time because she is black. She notes that her white female colleague, Ms. Jennifer Richards, was converted to a full-time employee within

---

were Ms. Hatch's joint employers, then either should be able to enforce the Agreement that governs claims arising out of the employment contemplated by the Agreement. *Id.* at 6, 9.

[23] Compl. (Doc. 1) ¶ 16. The Complaint is not crystal clear on whether an Optum employee or a Maxim employee made this statement. The Complaint alleges only that "plaintiff was told that within a period of six (6) to nine (9) months of her hire, she would be hired as a full-time employee of Optum." *Id.* At the hearing on the Motion to Compel Arbitration, however, counsel for Ms. Hatch clarified that the Complaint was alleging that a manager or supervisor from Optum made the statement. *See* June 2, 2022 Hr'g Tr. (Rough) at 24–26. Optum does not expressly deny the existence of an oral contract. And it implicitly recognizes in its briefing that Ms. Hatch was "eligible for conversion" to a full-time position after a certain period of time as a temporary worker. Def.'s Mem. in Supp. of Mot. to Compel Arb. (Doc. 8) at 5–6.

[24] Compl. (Doc. 1) ¶¶ 31–32.

[25] *Id.* ¶¶ 24–25.

[26] *Id.*

[27] *Id.* ¶ 34.

[28] *Id.* ¶ 35.

5

nine months of employment.[29]  She further notes that this occurred despite (1) what Ms. Hatch saw as Ms. Richards's "substandard work performance" and (2) Ms. Richards's husband "call[ing] and curs[ing] out [an Optum] management official."[30]

Ms. Hatch filed a Charge of Discrimination with the Equal Employment Opportunity Commission on April 9, 2021.[31]  The EEOC issued a Dismissal and Notice of Rights letter on August 16, 2021.[32]  Ms. Hatch filed this lawsuit on November 15, 2021.[33]

## DISCUSSION

Optum's Motion to Compel Arbitration implicates the Federal Arbitration Act.  Under that Act, and controlling Eighth Circuit precedent, the general rule for the Court to follow in resolving this Motion is clear: "[W]hen reviewing an arbitration clause, [the Court] ask[s] only (1) whether there is a valid arbitration agreement and (2) whether the particular dispute falls within the terms of that agreement."[34]  Neither party argues that the Agreement is invalid.  And there is nothing on the face of the Agreement or in the record that in any way suggests the Agreement is invalid.[35]  Accordingly, for purposes of this Order, the Court assumes that the Agreement is valid.  The real question is "whether the particular dispute falls within the terms of that agreement."[36]

---

[29] *Id.* ¶¶ 26, 28.

[30] *Id.* ¶¶ 28–30.

[31] Ex. A to Compl. (Doc. 1) at 9–10.

[32] Ex. B to Compl. (Doc. 1) at 11.

[33] Compl. (Doc. 1).

[34] *Faber v. Menard, Inc.*, 367 F.3d 1048, 1052 (8th Cir. 2004).

[35] This is true regardless of whether Arkansas law (the law of the forum state) or Maryland law (the law designated in the parties' Agreement) is applied to analyze the validity of the Agreement.  *See Alltel Corp. v. Rosenow*, 2014 Ark. 375, at 6 (2014) ("[T]he essential elements for an enforceable arbitration agreement are (1) competent parties, (2) subject matter, (3) legal consideration, (4) mutual agreement, and (5) mutual obligation."); *Holmes v. Coverall N. Am., Inc.*, 336 Md. 534, 544, 649 A.2d 365, 370 (1994) ("Once a court determines that the making of the agreement to arbitrate is not in dispute, its inquiry ceases, as the agreement to arbitrate has been established as a valid and enforceable contract.").

[36] *Faber*, 367 F.3d at 1052.

One aspect of that question is easy to decide. The Agreement is quite clear that Title VII discrimination and breach-of-contract claims fall within its scope.[37] But there is another aspect of the question that is more difficult. The Agreement is between only Maxim and Ms. Hatch. Moreover, the Agreement only expressly covers claims "between" Maxim and Ms. Hatch.[38] Does a claim between Optum and Ms. Hatch "fall[] within the terms of [such an] agreement"?[39] To answer this query, the Federal Arbitration Act instructs courts to look to state law.[40] In this case, the arbitration agreement at issue includes a choice-of-law provision.[41] Such a provision is "binding, unless it can be shown that the enforcement of the clause would be unreasonable and unfair."[42] Neither party has alleged the Agreement's choice-of-law clause is unreasonable or unfair.[43] So the Court will follow the choice-of-law clause.[44] That clause calls for the application of Maryland law in the "interpretation, . . . construction, enforcement and performance" of the Agreement.[45]

---

[37] Ex. A to Def.'s Mem. in Supp. of Mot. to Compel Arb. (Doc. 8-1) at 2.

[38] *Id.*

[39] *Faber*, 367 F.3d at 1052.

[40] "Neither [§ 2 or § 3 of the FAA] purports to alter background principles of state contract law regarding the scope of [arbitration] agreements . . . ." *Arthur Andersen LLP v. Carlisle*, 556 U.S. 624, 630 (2009). "State law . . . is applicable to determine which contracts are binding under § 2 [of the FAA] and enforceable under § 3 [of the FAA] if that law arose to govern issues concerning the validity, revocability, and enforceability of contracts generally." *Id.* at 630–31 (cleaned up).

[41] Ex. A to Def.'s Mem. in Supp. of Mot. to Compel Arb. (Doc. 8-1) at 7.

[42] *Provence v. Nat'l Carriers, Inc.*, 2010 Ark. 27, at 8, 360 S.W.3d 725, 729 (2010); *see also Nelms v. Morgan Portable Bldg. Corp.*, 305 Ark. 284, 287, 291, 808 S.W.2d 314, 315, 318 (1991) (finding that a contract clause designating Texas law as governing when interpreting the contract was enforceable because it was "fair and reasonable"); *Nat'l Glass, Inc. v. J.C. Penney Props., Inc.*, 336 Md. 606, 610, 650 A.2d 246, 248 (1994) (holding that "parties to a contract may agree as to the law which will govern their transaction" subject to the reasonableness and fundamental public policy limitations set forth in the Restatement (Second) Conflict of Laws § 187(2) (1971)) (citation omitted).

[43] *See* Def.'s Suppl. Mem. in Supp. of Mot. to Compel Arb. (Doc. 17) at 1–2; Pl.'s Resp. in Opp'n to Mot. to Compel Arb. (Doc. 16) at 6–8.

[44] *Cf. Donaldson Co., Inc. v. Burroughs Diesel, Inc.*, 581 F.3d 726, 731–32 (8th Cir. 2009) (applying Mississippi law to a similar question "based on the choice-of-law provision in the" agreement containing the arbitration provision).

[45] Ex. A to Def.'s Mem. in Supp. of Mot. to Compel Arb. (Doc. 8-1) at 7.

Optum argues that, under Maryland law, it can essentially step into the shoes of Maxim and force Ms. Hatch to arbitrate pursuant to the Agreement—even though Optum itself did not sign the Agreement. To support its position, Optum invokes two judicial doctrines that allow (in limited circumstances) a non-signatory to enforce an arbitration agreement against a signatory to that agreement.[46] As explained below, neither doctrine applies to the facts of this case. Moreover, even if one did, all that would mean is that Optum could theoretically enforce the Agreement. Given the express language of the Agreement—specifically limiting claims to those between Ms. Hatch and Maxim—Ms. Hatch's claims against Optum do not fall within the Agreement's scope.

**I.    The Ability of a Non-Signatory to Enforce an Arbitration Agreement**

Optum argues that it can enforce the Agreement for two reasons. First, Optum contends that it was an intended third-party beneficiary of the Agreement.[47] Second, Optum argues that Ms. Hatch is equitably estopped from refusing to arbitrate her claims against Optum.[48] As alluded to above, the ability of a non-signatory like Optum to enforce the arbitration agreement at issue here is governed by Maryland state law.[49] Under Maryland law, both of Optum's arguments fail. Optum has not shown that it is an intended third-party beneficiary of the Agreement between Ms.

---

[46] Def.'s Suppl. Mem. in Supp. of Mot. to Compel Arb. (Doc. 17) at 3, 9.

[47] Def.'s Mem. in Supp. of Mot. to Compel Arb. (Doc. 8) at 8–9; Def.'s Suppl. Mem. in Supp. of Mot. to Compel Arb. (Doc. 17) at 9–11.

[48] Def.'s Suppl. Mem. in Supp. of Mot. to Compel Arb. (Doc. 17) at 3–9. In its first Memorandum in Support of its Motion to Compel Arbitration, Optum argued (among other things) that Ms. Hatch must arbitrate because of Optum and Maxim's close relationship and because she has treated the two companies as a "single unit." Def.'s Mem. in Supp. of Mot. to Compel Arb. (Doc. 8) at 9–12. These arguments were tailored to Arkansas law—because at that point the parties had not yet realized that Maryland law applied. The arguments are not independently raised in the supplemental briefs addressing Maryland law. In any event, they are sufficiently close to Optum's equitable-estoppel arguments under Maryland law that the Court will address them under the equitable-estoppel rubric.

[49] "Chapter 1 of the Federal Arbitration Act (FAA) permits courts to apply state-law doctrines related to the enforcement of arbitration agreements. . . . The 'traditional principles of state law' that apply under Chapter 1 include doctrines that authorize the enforcement of a contract by a nonsignatory." *GE Energy Power Conversion France SAS, Corp. v. Outokumpu Stainless USA, LLC*, 140 S. Ct. 1637, 1643 (2020); *see also PRM Energy Sys., Inc. v. Primenergy, L.L.C.*, 592 F.3d 830, 833 (8th Cir. 2010) ("[S]tate contract law governs the ability of nonsignatories to enforce arbitration provisions.") (citations and quotation marks omitted).

Hatch and Maxim. Nor has Optum shown what it must for equitable estoppel—namely, that Ms. Hatch is alleging "substantial[] interdependent and concerted misconduct" by Optum and Maxim.[50]

### A. Intended Third-Party Beneficiary

To determine whether a party is a third-party beneficiary to a contract under Maryland law, "the controlling issue is whether the contract's terms, in light of the surrounding circumstances, reveal an intent to make the promise to the third party in fact if not in form."[51] The crucial factor is thus "whether the pertinent provisions in the contract were inserted to benefit the third party."[52]

Optum argues that the signatories to the Agreement intended to benefit Optum by including the "broad language, covering 'any and all' disputes that might arise from Plaintiff's employment."[53] But this argument ignores important neighboring language in the Agreement— language that comes immediately after (but in the same sentence as) the "any and all" language quoted by Optum. The fuller quote from the Agreement reads, "[A]ny and all Claims between

---

[50] *Griggs v. Evans*, 205 Md. App. 64, 83, 43 A.3d 1081, 1092 (Md. Ct. Spec. App. 2012). *Griggs* is from Maryland's intermediate court of appeals. This Court is cognizant that "the State's highest court is the best authority on its own law." *C.I.R. v. Bosch's Est.*, 387 U.S. 456, 465 (1967). The parties have not provided, and the Court has not found, a case from Maryland's highest court (the Maryland Court of Appeals) discussing the application of equitable estoppel in the relevant arbitration-enforcement context. *See, e.g.*, *Schuele v. Case Handyman & Remodeling Servs., LLC*, 412 Md. 555, 560, 989 A.2d 210, 213 (2010) ("In this case, we are asked to decide whether under Maryland law a non-signatory to a contract may invoke equitable estoppel to enforce an arbitration provision contained within the contract. We are precluded from answering that question . . . ."). In the absence of a Maryland Court of Appeals decision, the Court looks to Maryland's "intermediate appellate state court [as] a datum for ascertaining [Maryland] state law . . . ." *C.I.R.*, 387 U.S. at 465 (ellipses and quotation marks omitted). This Court will follow the lead of the Fourth Circuit and District Court for the District of Maryland, and thus will apply the rules laid down in *Griggs*. *See Lomax v. Weinstock, Friedman & Friedman, P.A.*, 583 F. App'x 100, 101 (4th Cir. 2014); *Felix v. Richard D. London & Assocs., P.C.*, No. GLR-19-2795, 2020 WL 4933632, at *2 n.4 (D. Md. Aug. 24, 2020); *Dennie v. MedImmune, Inc.*, No. PX 16-3643, 2017 WL 2930462, at *4 (D. Md. July 10, 2017).

[51] *Thompson v. Witherspoon*, 197 Md. App. 69, 88, 12 A.3d 685, 696 (Md. Ct. Spec. App. 2011) (citation and internal quotation marks omitted); *see also 120 W. Fayette St., LLLP v. Mayor of Balt.*, 426 Md. 14, 36, 43 A.3d 355, 368 (2012) ("An individual is a third-party beneficiary to a contract if the contract was intended for his or her benefit and it clearly appears that the parties intended to recognize him or her as the primary party in interest and as privy to the promise.") (cleaned up).

[52] *CR-RSC Tower I, LLC v. RSC Tower I, LLC*, 429 Md. 387, 457, 56 A.3d 170, 212 (2012) (cleaned up).

[53] Def.'s Suppl. Mem. in Supp. of Mot. to Compel Arb. (Doc. 17) at 10.

[Ms. Hatch] and MAXIM . . . ."[54] Unless the contractual term "Maxim" is read to include "Optum," it is impossible to conclude (from the Agreement itself) that Optum was an intended beneficiary. And there is no way to read "Maxim" so broadly. That is especially true because the Agreement sets out a specific definition for the term Maxim: "[Maxim Healthcare Services, Inc.] or any affiliated company and/or any of its parents, subsidiaries, affiliates, agents, officers, directors, successors, agents, assigns, employees . . . ."[55]

Optum is Maxim's client and admits that the Agreement's language "does not expressly apply to MAXIM's customers/clients . . . ."[56] Optum's best argument on this point—and best does not mean good—is that the term "affiliates" and the phrase "any affiliated company" were intended to include Maxim's clients. But Optum has provided no evidence to support that position, and no known definition of "affiliates" or "affiliated company" extends so far.[57] Optum's position runs

---

[54] Ex. A to Def.'s Mem. in Supp. of Mot. to Compel Arb. (Doc. 8-1) at 2.

[55] *Id.*

[56] Def.'s Suppl. Mem. in Supp. of Mot. to Compel Arb. (Doc. 17) at 10; *see also* Def.'s Mem. in Supp. of Mot. to Compel Arb. (Doc. 8) at 4. At oral argument, Optum's counsel all but conceded that this is a serious problem for his client's position. *See* June 2, 2022 Hr'g Tr. (Rough) at 5 ("To be frank, would we prefer it said clients in the arbitration agreement, of course . . . ."); *see also CR-RSC Tower I, LLC*, 429 Md. at 457, 56 A.3d at 212 (holding that another "'factor to consider' . . . is whether the third party is named in the contract . . .") (citation omitted).

[57] *See* Def.'s Suppl. Mem. in Supp. of Mot. to Compel Arb. (Doc. 17) at 9–11. The Court's exchange with counsel for Optum at oral argument is illustrative of the point:

> THE COURT: But [Optum is] not alleging an affiliate status, at least under any definition that I have seen. I guess what I'm trying to figure out is what is the definition -- what is your definition of affiliate that you think applies here?
>
> MR. MAGNUS: I don't have -- I am using a common sort of lay understanding of affiliate.
>
> THE COURT: Let me stop you there. When you say you are using the common lay understanding of affiliate, if you pointed me to a dictionary, if you pointed me to -- I mean let's even say if you used corpus linguistics to show me that is what it means, if you pointed me to a news article, those are things maybe you could then say you are using a common definition. I guess what I'm trying to ask you is where have you come up with this common definition other than your head in a fancy legal argument.
>
> MR. MAGNUS: Obviously, if I had done that it would have been in the brief. So I did not research that.

June 2, 2022 Hr'g Tr. (Rough) at 5.

counter to the textbook definition and judicial use of the word "affiliate."[58]  Black's Law Dictionary defines "affiliate" as "[a] corporation that is related to another corporation by shareholdings or other means of control; a subsidiary, parent, or sibling corporation."[59]  And as best the Court can tell, Maryland courts use the term "affiliate" nearly exclusively in the way Black's Law Dictionary defines it.[60]  In short, it is clear to the Court that the definition of Maxim in the Agreement does not include Optum.

Optum's "intended beneficiary" theory is not limited to the actual words of the Agreement.  Optum also argues that it must have been an intended beneficiary of the Agreement because the parties knew, when they entered the Agreement, that Ms. Hatch was going to work at Optum.  This logic is flawed.  Even if we assume that both parties contemplated that Ms. Hatch would be working exclusively with Optum, that doesn't mean that the Agreement was meant to cover (and thereby benefit) Optum.  The more natural reading of the Agreement is that Maxim wanted to ensure it (and it alone) would not be haled into court for anything that happened to Ms. Hatch while she was an employee of Maxim—regardless of whether Maxim or one of its clients was the alleged wrongdoer.  There's no reason to think Maxim particularly cared whether its client was haled into court.  And there's certainly no reason to think Ms. Hatch wanted the Agreement to extend to claims against Optum.

It is of course true that the Maxim-Hatch relationship (which included the Agreement) operated to benefit Optum.  After all, Maxim placed Ms. Hatch to work for Optum.  But that's not

---

[58] *See Rourke v. Amchem Prods., Inc.*, 153 Md. App. 91, 125–26, 835 A.2d 193, 212–13 (Md. Ct. Spec. App. 2003) (using Black's Law Dictionary and "[j]udicial use" to discern the meaning of a word in a contract), *aff'd* 384 Md. 329, 863 A.2d 926 (2004).

[59] *Affiliate*, *Black's Law Dictionary* (11th ed. 2019).

[60] *See, e.g.*, *Gore Enter. Holdings, Inc. v. Comptroller of Treasury*, 437 Md. 492, 500, 515, 87 A.3d 1263, 1267, 1275 (2014) (referring to two "wholly-owned subsidiary" companies as "affiliates" of their parent company).

11

conclusive of anything. "It is not enough that [a] contract merely operates to an individual's benefit . . . ."[61] Ms. Hatch and Maxim must have entered into the Agreement with the intention of the Agreement benefiting Optum. The Agreement's language and the circumstances surrounding it do not establish the necessary intent.[62] So Optum's third-party beneficiary theory fails.

### B. Equitable Estoppel

Under Maryland law, "[t]he doctrine of equitable estoppel permits non-signatories to enforce an arbitration provision" in two instances.[63] The first is "when a signatory must rely on the terms of the written agreement containing the arbitration clause in asserting its claims . . . ."[64] Nearly always, this estoppel theory comes into play when the arbitration clause is part of a broader

---

[61] *CR-RSC Tower I, LLC*, 429 Md. at 457, 56 A.3d at 212 (quoting *120 W. Fayette St.*, 426 Md. at 35–36, 43 A.3d at 368).

[62] Globally, Optum emphasizes what it considers to be an indirect admission from Ms. Hatch that the Maxim-Hatch Arbitration Agreement covers employment-related claims against Optum. Def.'s Suppl. Mem. in Supp. of Mot. to Compel Arb. (Doc. 17) at 6. This so-called admission allegedly took place in a previous lawsuit—a wage-and-hour complaint against Optum. *Id.* Ms. Hatch was initially a named plaintiff in that case. *See Traylor v. Optum Gov. Sols., Inc., et al.*, No. 4:21-CV-274-LPR (E.D. Ark.), Compl. (Doc. 1). The Amended Complaint in that case removed her from the action, explaining that "[t]he purpose of [the] amendment [was] to remove Taquilla Hatch as a Plaintiff, as she entered a binding arbitration agreement with a third-party staffing company and was assigned to work by that staffing company to Optum Government Solutions, Inc. . . . ." *Traylor*, Am. Compl. (Doc. 17) ¶ 3; Ex. B to Def.'s Mem. in Supp. of Mot. to Compel Arb. (Doc. 8-2) at 3. Optum seizes on this language for its present arguments that arbitration is in order in the instant case. However, while the statement in the previous lawsuit gives Optum a good rhetorical point, that is all it does. The Amended Complaint in the prior case came before an Answer, so leave of the Court was not required for any amendment. Thus, judicial estoppel is not applicable here. In short, the reasons Ms. Hatch was dropped from the prior lawsuit are legally irrelevant to the instant lawsuit. Optum conceded as much in the hearing on the Motion to Compel Arbitration. The exchange between Optum's counsel and the Court went as follows:

> THE COURT: That strikes me as a tonal and atmospheric argument, as opposed to an argument having kind of legal implications. Am I right about that or wrong about that?
>
> MR. MAGNUS: You are most definitely right about that.
>
> THE COURT: That doesn't mean it's unimportant. I'll take it for what it's worth, but that is not sort of a smoking gun . . . .
>
> MR. MAGNUS: Oh, no. The truth of the matter is it created an expectation from my client that this was going to be arbitrated because she had done it once before, which put me in the position of having to move. And that is as atmospheric as it gets.

June 2, 2022 Hr'g Tr. (Rough) at 18.

[63] *Griggs*, 205 Md. App. at 82–83, 43 A.3d at 1092 (footnote omitted).

[64] *Id.* (cleaned up).

12

employment contract that the employee is suing under. That's not the case here. The Agreement is a standalone agreement. It is not part of some broader written employment contract. It should be no surprise, then, that Ms. Hatch's claims do not invoke the terms of the Agreement. She does not rely on the Agreement in making her Title VII and state common law breach-of-contract claims. So Optum can't rely on this theory of equitable estoppel to compel arbitration. Optum concedes this point.[65]

The second theory of estoppel is closer to the mark. It applies "when the signatory to the contract containing an arbitration clause raises allegations of substantially interdependent and concerted misconduct by both the non-signatory and one or more of the signatories to the contract . . . ."[66] Optum argues that this estoppel theory fits the bill because (1) Ms. Hatch's claims "directly relate to her employment with [Maxim]," and (2) Ms. Hatch has based her claims "on facts that allege interdependent, concerted misconduct by Optum and [Maxim]."[67]

Optum relies heavily on *MS Dealer Service Corp. v. Franklin*.[68] Optum correctly notes that this is "the case that informed Maryland's adoption of equitable estoppel in the arbitration context . . . ."[69] In *MS Dealer*, the plaintiff was forced to arbitrate her claims against a non-signatory defendant because her claims were "inherently inseparable" from those that she brought against a signatory defendant.[70] Of course, there is an obvious difference between *MS Dealer* and our case. Ms. Hatch is not suing Maxim (the signatory to the Agreement). That difference may

---

[65] Def.'s Suppl. Mem. in Supp. of Mot. to Compel Arb. (Doc. 17) at 2.

[66] *Griggs*, 205 Md. App. at 83, 43 A.3d at 1092 (cleaned up).

[67] Def.'s Suppl. Mem. in Supp. of Mot. to Compel Arb. (Doc. 17) at 4.

[68] 177 F.3d 942 (11th Cir. 1999), *abrogated on other grounds by Arthur Andersen LLP*, 556 U.S. at 631.

[69] Def.'s Suppl. Mem. in Supp. of Mot. to Compel Arb. (Doc. 17) at 4; *see also Griggs*, 205 Md. App. at 85, 43 A.3d at 1093 (referring to *MS Dealer* as "[i]llustrative of [the second] application of equitable estoppel").

[70] *MS Dealer*, 177 F.3d at 948. The plaintiff in the case asserted that the signatory and non-signatory defendants "improperly cooperated, conspired and otherwise colluded . . . in a scheme to defraud her . . . ." *Id.* at 945.

not be automatically fatal to Optum's position under Maryland law.[71] But, at the very least, it calls for caution in employing equitable estoppel. The cases that the Court has reviewed from Maryland, the Fourth Circuit, and the federal district court in Maryland suggest that allegations of concerted wrongdoing on the part of the signatory and non-signatory must be made to trigger this type of equitable estoppel.[72]

Ms. Hatch is not alleging that Maxim engaged in any wrongdoing. For example, Ms. Hatch is not alleging that Maxim discriminated against her or breached a contract. Ms. Hatch is not alleging that Maxim helped Optum discriminate against her or breach a contract. Ms. Hatch is not alleging that Maxim knew of Optum's alleged discrimination or contractual breach, let alone that Maxim knew about those things and failed to take corrective action. In short, there's no

---

[71] *See generally Int'l Paper Co. v. Schwabedissen Maschinen & Anlagen GMBH*, 206 F.3d 411, 416–17 (4th Cir. 2000) ("Well-established common law principles dictate that *in an appropriate case* a nonsignatory can enforce, or be bound by, an arbitration provision . . . .") (emphasis added).

[72] Optum appears to concede this—at least to some extent—when it "acknowledges that . . . the Fourth Circuit has produced divergent holdings in applying the equitable estoppel grounds . . . ." Def.'s Suppl. Mem. in Supp. of Mot. to Compel Arb. (Doc. 17) at 9. Optum cites *Brantley v. Republic Mortgage Insurance Co.*, 424 F.3d 392, 396 (4th Cir. 2005) as an example, noting that, in that case, the "defendant could not invoke [the] arbitration agreement because . . . [plaintiff's] claims were not part of [the] underlying contract, and [plaintiff made] allegations only as to one defendant." Def.'s Suppl. Mem. in Supp. of Mot. to Compel Arb. (Doc. 17) at 9. *Brantley* is the tip of the iceberg. "[A]t a minimum, there must be allegations of 'coordinated behavior between a signatory and a nonsignatory' defendant . . . ." *Aggarao v. MOL Ship Mgt. Co., Ltd.*, 675 F.3d 355, 374 (4th Cir. 2012) (citation omitted) (holding that plaintiff was equitably estopped from avoiding arbitration with both signatory and non-signatory defendants where "[t]he conduct of [all three defendants, signatory and non-signatory,] was coordinated by virtue of each defendant's alleged involvement . . . ."); *see also Long v. Silver*, 248 F.3d 309, 317–20 (4th Cir. 2001) (compelling arbitration of claims against signatory corporation and non-signatory shareholders because the claims against both were "closely intertwined" and arose out of the agreement); *J.J. Ryan & Sons, Inc. v. Rhone Poulenc Textile, S.A.*, 863 F.2d 315, 320 (4th Cir. 1988) (compelling arbitration of claims against signatory subsidiary company and non-signatory parent company because the claims were "based on the same facts and [were] inherently inseparable"); *Griggs*, 205 Md. App. at 90, 43 A.3d at 1096 (holding that equitable estoppel was not applicable where "the [plaintiffs'] complaint [did] not allege any wrongdoing by . . . the signatory . . ."); *Horneffer v. St. Joseph Med. Ctr.*, No. MJG-11-410, 2012 WL 983782, at *5–6 (D. Md. Mar. 21, 2012) (compelling arbitration of claims against non-signatories where plaintiff alleged that the non-signatories and signatories "act[ed] in concert to interfere with his rights" under the signed agreement); *Dennie*, 2017 WL 2930462, at *4 (holding that plaintiff was equitably estopped from avoiding arbitration of claims against non-signatory where plaintiff's "complaint [pleaded] concerted conduct between the" signatory and non-signatory); *Mangani-Kashkett v. Bouquet*, No. PWG-13-1215, 2013 WL 3146939, at *5–6 (D. Md. June 18, 2013) (requiring plaintiff to arbitrate her claim against non-signatory because she "allege[d] that [the] non-signatory, and its employee, . . . a signatory, breached the [agreement] . . .").

allegation of concerted action that comes anywhere close to the type of concerted action that has qualified for equitable estoppel in Maryland.

Optum's "concerted action" hypothesis is entirely dependent on the idea that a joint-employer relationship *on its own* is enough to trigger this type of equitable estoppel. That's a highly dubious proposition, and Optum provides no Maryland caselaw for it. In any event, for its joint-employer theory, Optum points to Ms. Hatch's allegations that Maxim issued her paycheck,[73] assisted her in taking a tuberculosis test once per year,[74] assigned her to work for Optum,[75] and was notified by Optum of concerns regarding Ms. Hatch's performance.[76] Optum also points out that Ms. Hatch admits that she was "hired by" and "worked for" Maxim.[77] Optum argues that Ms. Hatch is obviously alleging the existence of a joint-employer relationship. But even if she is, the "jointness" is far removed from the allegations of discrimination or contractual breach. Indeed, the discrimination and contractual breach alleged here is solely about Optum's decision not to hire her as a full-time employee. There is no allegation that Maxim was involved in any way in that decision.[78] And that is the missing ingredient.

## II.   Scope of the Arbitration Agreement

Optum faces an additional problem in this case. To explain it, let us assume (counterfactually) that either the intended-beneficiary theory or the equitable-estoppel theory applied to this case. All that means is that Optum could enforce the Agreement despite being a

---

[73] Compl. (Doc. 1) ¶ 15.

[74] *Id.*

[75] *Id.* ¶ 9.

[76] *Id.* ¶ 13.

[77] *Id.* ¶¶ 9–10.

[78] *See Griggs*, 205 Md. App. at 90, 43 A.3d at 1096 (concluding that compelling arbitration was inappropriate where the plaintiffs' allegations did "not allege any wrongdoing by . . . the signatory to the arbitration" agreement).

non-signatory.[79] In many situations, that's the whole ball game—because whatever arbitration agreement is at issue is written very broadly to cover "all employment-related claims" with no qualifications. So the employee's claim against a non-signatory tends to fall within the scope of the broadly worded agreement. However, the arbitration agreement in the instant case is different. As explained above in the Background Section, the Agreement specifically and repeatedly limits the scope of arbitrable claims to those "between" Maxim and Ms. Hatch.

Optum seeks not only to enforce the Agreement as a non-signatory, but to broaden the internal limitations of the Agreement's scope. It's not clear that any judge-made doctrine does or should allow that type of violence to the plain language of a private contract. It is true, as Optum says, that "the FAA was designed to promote arbitration."[80] But that doesn't mean courts are supposed to tilt the scales in favor of arbitration. It means courts should read arbitration contracts like other contracts, without the judicial hostility toward arbitration that marked a bygone jurisprudential era. The Supreme Court has made a similar point, clarifying that the FAA's policy favoring arbitration "is to make arbitration agreements as enforceable as other contracts, but not more so."[81] And the Eighth Circuit has made clear that "a party cannot be compelled to arbitrate unless it has contractually agreed to be bound by arbitration."[82] Here, Ms. Hatch agreed to arbitrate claims "between" her and Maxim. She did not agree to anything more.

---

[79] *See Hagerstown Block Co. v. Durbin*, No. 0737, 2015 WL 5926086, at *5, *11 (Md. Ct. Spec. App. July 15, 2015) (affirming trial court's order compelling arbitration where non-signatories invoked doctrine of equitable estoppel and the claims "fell within the scope of the broadly-worded arbitration clause . . ."); *cf. Am. Bankers Ins. Grp., Inc. v. Long*, 453 F.3d 623, 630 (4th Cir. 2006) ("[E]stoppel does not preclude a party from making the quite different argument that its claims do not fall within the scope of the arbitration clause.").

[80] *AT&T Mobility LLC v. Concepcion*, 563 U.S. 333, 345 (2011).

[81] *Morgan v. Sundance, Inc.*, 142 S. Ct. 1708, 1713 (2022) (internal quotation marks omitted); *see also Volt Info. Scis., Inc. v. Bd. of Trs. of Leland Stanford Junior Univ.*, 489 U.S. 468, 478 (1989) ("[The FAA] simply requires courts to enforce privately negotiated agreements to arbitrate, like other contracts, in accordance with their terms.").

[82] *Duncan v. Int'l Mkts. Live, Inc.*, 20 F.4th 400, 402 (8th Cir. 2021).

## CONCLUSION

Optum's Motion to Compel Arbitration and to Dismiss or Stay this Case is DENIED.

IT IS SO ORDERED this 11th day of October 2022.

_____
LEE P. RUDOFSKY
UNITED STATES DISTRICT JUDGE